EXHIBIT S

11/13/2019          https://advance.lexis.com/documentprint/documentprintclick/?pdmfid=1000516&crid=15753b5d-3f68-472c-a5c8-fa02be75d807&ecomp...

Lexis Advance®
Research

**Document:** McKinley v. Lycoming, 2012 U.S. Dist. LEXIS 59957

---

## McKinley v. Lycoming, 2012 U.S. Dist. LEXIS 59957

**Copy Citation**

United States District Court for the Middle District of Pennsylvania

April 30, 2012, Decided; April 30, 2012, Filed

No. 4:10-CV-00921

**Reporter**

**2012 U.S. Dist. LEXIS 59957 \*** | 2012 WL 1514880

GARY MCKINLEY, Plaintiff, v. LYCOMING, A TEXTRON COMPANY and UAW LOCAL 787, Defendants.

## Core Terms

employees, younger, coworkers, age discrimination, harassment, training, summary judgment motion, resignation, replacements, discipline, prima facie case, last chance, allegations, improvement plan, termination, grievance, proffered, constructive discharge, wrongful discharge, summary judgment, documentation, nonproductive, genuine issue, articulated, complaints, conspiracy, contends, reasons, genuine issue of material fact, adverse employment action

**Counsel:** **[\*1]** For Gary McKinley, Plaintiff: Peter G. Loftus ▼, LEAD ATTORNEY, Loftus Law Firm, P.C. ▼, Waverly, PA.

For Lycoming, A Textron Company, Defendant: Robin A. Read ▼, McNerney, Page, Vanderlin and Hall ▼, Williamsport, PA.

For UAW Local 787, Defendant: Robin A. Read ▼, McNerney, Page, Vanderlin and Hall ▼, Williamsport, PA; William T. Josem ▼, Cleary & Josem LLP ▼, Philadelphia, PA.

**Judges:** Hon. John E. Jones III ▼.

**Opinion by:** John E. Jones III ▼

Opinion

**MEMORANDUM**

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Presently pending before the Court are the Motions for Summary Judgment of both Defendants. (Docs. 20, 22). The Motions have been fully briefed and are thus ripe for disposition. For the reasons fully articulated herein, we will grant both motions in their entirety and dismiss the Plaintiff's Complaint with prejudice.

## I. PROCEDURAL HISTORY

Plaintiff Gary McKinley ("Plaintiff" or "McKinley") commenced the above-captioned action by filing a Complaint against Defendant Lycoming, A Textron Company ("Lycoming"), and Defendant UAW Local 787 ("Local 787" or "the Union"), collectively "Defendants," on April 30, 2010. (Doc. 1). [1 ⬇] Local 787 filed its Answer and Affirmative Defenses on July 6, 2010 (Doc. 4) and Lycoming filed a separate Answer **[*2]** and Affirmative Defenses on July 8, 2010. (Doc. 5).

Following a period of discovery, both Defendants filed the instant Motions for Summary Judgment on September 1, 2011. (Docs. 20, 22). After numerous motions to extend the briefing period were granted, the Motions have been fully briefed and are thus ripe for the Court's review. (Docs. 21, 25, 37, 51, 52).

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving **[*3]** party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). **[*4]** However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw therefrom. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## III. STATEMENT OF FACTS

The following facts are derived from the record and viewed in the light most favorable to the Plaintiff in accordance with the standard of review applicable to a motion for summary judgment. The facts stated herein will be supplemented as necessary by additional facts throughout our analysis.

Plaintiff Gary McKinley ("Plaintiff") is an adult individual born November 24, 1950. (Doc. 23, ¶ 1). Defendant Lycoming, A Textron Company, ("Defendant Lycoming") is a Pennsylvania corporation with a **[*5]** principal place

of business in Williamsport, Pennsylvania. (Doc. 22-1, ¶ 4). Defendant UAW Local 787 ("Defendant Union") is a labor union with a principal place of business located in Williamsport, Pennsylvania. (Id. ¶ 1).

Plaintiff was hired as a replacement worker during a highly contested strike at Defendant Lycoming's manufacturing plant on or about June 1, 1998. (Id. ¶ 6; Doc. 23, ¶¶ 2-3). Plaintiff was initially hired as a Drafter but was promoted to Checker A on January 31, 2005. (Doc. 23, ¶¶ 4-5). Plaintiff was a member of the Defendant Union, and the relationship between the Defendant Union and Defendant Lycoming was governed by a Collective Bargaining Agreement. (Doc. 22-1, ¶ 7, Ex. 1; Doc. 23, ¶ 7; ).

Beginning early on in his employment and continuing throughout, Plaintiff was singled out by the other union members, all of whom were younger than him. (Doc. 37-1, ¶ 8). In his affidavit, Plaintiff states that the younger employees were treated favorably and got away with things, so he needed to be "on guard all day long due to the harassment" that the younger employees subjected him to. (Doc. 37-1, ¶ 8). He states that the work environment became unbearable, with the younger [*6] employees constantly harassing him. (Id.). He avers that he was cursed at, made fun of, "shoulder-bumped," given the finger, and that derogatory comments were made to third parties about Plaintiff. (Id.).

Plaintiff complained to his supervisor that younger employees were not receiving proper training, but when he asked management for permission to train the employees, his request was denied. (Doc. 23, ¶ 19; Doc. 37-1, ¶ 19). Plaintiff repeatedly states that jobs that should have been given to him were given to younger employees and that he was denied training opportunities made available to younger employees, although he offers no evidence to support this claim. (Doc. 37-1, ¶¶ 16-18). In his affidavit, Plaintiff states that "[y]ounger employees were always being sent to school out West" and that he was denied this opportunity. (Doc. 37-1, ¶ 6). Plaintiff explained that he did not present these issues to the union as grievances because he did not believe that it would get him anywhere because the union representatives were younger employees. (Doc. 37-1, ¶ 9).

Throughout his employment, Plaintiff kept detailed daily notes tracking the actions of the younger union employees. The record [*7] contains hundreds of pages of the Plaintiff's personal notes, documenting the younger employees' actions during the work day. (See Doc. 23, ¶ 21; Doc. 37-1, ¶ 21). The record includes extensive documentation, to the minute, of coworkers' daily activities, noting, in addition to allegedly harassing behaviors, for example: coworker belching (Doc. 24-11, p.2), the time of day that specific coworkers would exit and enter the room (e.g., Doc. 24-11, p. 2), and observing and commenting upon particular employees' attire. (Doc. 24-11, p. 5). Plaintiff admits that he was keeping notes "almost from the start of [his] employment" and that other employees did too, although not to the same extent. (Doc. 44, Plaintiff's Exhibit DDD, ¶ 61).

Plaintiff's friend and former coworker, Walter Cacko, stated in his affidavit that he "personally witnessed the harassment and hostile work environment that Plaintiff was subjected to." (Doc. 37-1, ¶ 29). He explained that the younger union employees would loudly crunch paper on certain days and slam their desk drawers in order to annoy others. (Cacko Aff.,¶¶ 7-8). Cacko also explained that he was personally disliked merely for associating with the Plaintiff. (Doc. [*8] 37-1, ¶ 29). He stated that he and Plaintiff had been to Detroit for training but that "they never received the same training that the younger employees received," pointing out that the younger employees would get "play time" on the computers while he and Plaintiff continued to work. (Doc. 37-1, ¶ 16). He also stated that he learned from another employee that the reason that the other employees disliked Plaintiff and treated him poorly was because "[Plaintiff] is a scab and [the other employees] don't like scabs." (Doc. 37, Ex. C, ¶ 17).

Edward Bohart, Jr., another former employee of Defendant Lycoming, stated that like Plaintiff, he kept notes of incidents at work, but was never told that he could not do so. (Doc. 37-1, ¶ 21). In his affidavit, Bohart stated that the younger union employees seemed to get away with things that they should not have and that Plaintiff took the "brunt" of their behavior. (Doc. 37-1, ¶ 9).

In the summer of 2007, Defendant Lycoming discovered that Plaintiff was keeping daily logbooks chronicling work place events. (Doc. 23, ¶ 21; Ex. F, K). On July 23, 2007, Suzette Snyder, Defendant Lycoming's Human Resources Director, issued Plaintiff an Employee Discipline [*9] Record for violation of company rules, specifically for non-productive behavior, verbally reprimanded him, and instructed him to cease using work time to "observe, notate, and report on co-workers' behavior." (Doc. 23, ¶¶ 22-24). Plaintiff continued to keep notes, and between August 20 and 27, 2007, he submitted a series of complaints to Defendant Lycoming's management regarding coworkers. (Doc. 23, ¶ 25). On August 28, 2007, Plaintiff was issued a Performance Improvement Plan and Last Chance Agreement and referred to Employee Assistance Program counseling. (Doc. 23, ¶ 26). Plaintiff submits in his affidavit that these actions had nothing to do with nonproductive behavior but were instead retaliatory actions for his complaints about the younger union employees. (Doc. 37-1, ¶ 23-24). On September 25, 2007, Plaintiff submitted a resignation letter and two-weeks notice, citing "other opportunities" as the reason for his resignation. (Doc. 23, ¶¶ 27-28; Doc. 37-1, ¶¶ 27-28).

Prior to his last day of work, Plaintiff submitted to Defendant Lycoming an exit interview form, with supplemental pages attached, again documenting his complaints. (Doc. 23, ¶ ¶ 31-33). In this document, Plaintiff [*10] does not list age discrimination as a concern, but does state that he believes certain younger union members were not disciplined as they should have been, that the company has failed to adequately respond to the Plaintiff's complaints about younger employees' behavior, and that supervisors and managers were not doing a satisfactory or efficient job of running the department. (Doc. 23, ¶ 33). In that same letter, Plaintiff cited "other opportunities" as the grounds for his resignation. (Doc. 23, ¶ 28). Thereafter, Plaintiff requested unemployment compensation benefits and filed an unfair labor charge with the National Labor Relations Commission; while both of these filings refer to harassment and a hostile work environment, Plaintiff did not specifically cite age discrimination as the basis for his resignation. (Doc. 23, ¶¶ 33-39; Doc. 37-1 ¶¶ 33-39).

## IV. DISCUSSION

In his Complaint, Plaintiff asserts causes of action against the collective Defendants for violation of the Age Discrimination in Employment Act ("ADEA") (Counts I-V) in addition supplemental state law claims for wrongful discharge (Count VI), conspiracy (Count VII), and violation of the Pennsylvania Human Relations Act ("PHRA") **[*11]** (Count VIII). (Doc. 1). We first address Plaintiff's ADEA arguments with respect to each Defendant before turning to analysis of Plaintiff's state law claims.

### A. ADEA Claims Against Lycoming

As both Defendants point out, claims of age discrimination under the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005) (applying burden-shifting analysis adopted in Title VII case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to ADEA claims). The Third Circuit has succinctly articulated the *McDonnell Douglas* paradigm as follows:

> An employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision . . . . If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual."

*Id.* at 184-85. *See Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005) (applying burden-shifting analysis adopted

**[*12]** in Title VII case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),

to ADEA claims). Thus, we first consider whether Plaintiff has proven a prima facie case of age discrimination.

### 1. Plaintiff's Prima Facie Case

To establish the elements of his prima facie case, a plaintiff must prove that he: "(1) was a member of the protected class, i.e., was over 40, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300-01 (3d Cir. 2004). If he succeeds in doing so, the burden will shift to the employer to present evidence of a legitimate, nondiscriminatory reason for the adverse action. *Fasold*, 409 F.3d at 184.

The Plaintiff easily meets the first two elements of the test as he has successfully established that he is a member of a protected class and that he was qualified for the position. Both Defendants concede that the Plaintiff is a member of the protected class by virtue of his age; Plaintiff was born on November 24, 1950, and was forty-eight (48) years old when hired and fifty-six (56) years old when **[*13]** he resigned. (Doc. 23, ¶ 1; Doc. 25, p. 10). The Plaintiff was initially hired in June of 1998; he worked for Defendant Lycoming for nine (9) years and was promoted to his most recent position on January 31, 2005. (Doc. 22-1, ¶¶ 5-6; Doc. 24-6, ¶¶ 5-8). Defendant Lycoming, the hiring entity, concedes that the Plaintiff was qualified for the position, and while Defendant Union denied the same in its Answer, it does not argue the point in its brief. (*See* Doc. 1, ¶ 8; Doc. 21, p. 10; Doc. 25, p. 4 at n.5).

Plaintiff has likewise satisfied the fourth and final element by demonstrating that he was replaced by employees younger than him. Plaintiff stated in his answer to interrogatories, and Defendant Lycoming affirms in its statement of undisputed material facts, that the Plaintiff was replaced by two (2) employees, Christopher Croff and Jon Engle, who were both in their mid-forties at the time of their inter- company transfer. (Doc. 23, ¶ 41; Doc. 24-17, ¶ 23). The Defendants contend that Plaintiff's replacements are over the age of forty and that they, too, are members of the protected class, and thus argue that any potential for age discrimination liability is negated. However, the Defendants **[*14]** overlook that the fourth element requires only that the replacement is "sufficiently younger" than the plaintiff and does not automatically bar claims where replacement workers themselves are over the age of forty. *See Monaco*, 359 F.3d at 300-01. Thus the replacements' membership in the protected class is irrelevant so long as the replacements were "sufficiently younger" than the Plaintiff.

The record demonstrates that the two replacements were at least ten (10) years junior to the Plaintiff, (Doc. 23, ¶ 41, Doc. 24-17, ¶ 23), and we cannot find as a matter of law that such a substantial age gap is "insufficient" as contended by the Defendants on these facts. *See, e.g., D'Amico v. Pulte Homes, Inc.*, 2009 U.S. Dist. LEXIS 26441, *7-9 (E.D. Pa. Mar. 23, 2009)* (eight year age difference sufficiently younger); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729-30 (3d Cir. 1995) (ten-year age difference sufficient to support prima facie case)). Plaintiff has presented sufficient evidence to meet the fourth element of his prima facie case.

We thus proceed to the third and most difficult element, which is whether the Plaintiff has demonstrated that he suffered an adverse employment decision or action. **[\*15]** The Plaintiff argues in support of this element that his resignation was not voluntary and that he was in fact constructively discharged, forced to quit based on increasing discrimination, thus rising to the level of an adverse employment decision. Plaintiff also contends that Defendant Lycoming's actions in placing him on a Last Chance Agreement and Performance Improvement Plan, which included a requirement that Plaintiff participate in an Employee Assistance Program, were discriminatory in that other, younger employees who should have been so treated were not. Finally, Plaintiff argues that Defendant Lycoming provided training to younger employees that he was denied, and as a result, intentionally made him ineligible for certain employment opportunities.

Plaintiff's constructive discharge claim requires this Court to consider whether the Plaintiff resigned as a result of age discrimination which made employment conditions "so intolerable" that a reasonable person in his position would likewise have resigned. *See Duffy v. Paper Magic Group*, 265 F.3d 163, 167 (3d Cir. 2001); *see also* EMPLOYMENT DISCRIMINATION, § 127.06 (2011). Specifically, a court must consider the evidence of age **[\*16]** discrimination and "determine whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy*, 265 F.3d at 167. After careful study of all of the evidence currently before the Court, we cannot find that a genuine issue of material fact exists with regard to whether Plaintiff was constructively discharged due to age discrimination.

Plaintiff alleges that he was severely harassed, that "nails were placed under his tires, a dead possum was placed in his mailbox, he was repeatedly shoulder bumped, he was being followed to [the] men's room to the point that he had to go out of his way to use another restroom facility, water was intentionally spilled on the floor next to his cubicle, there was excessive name calling, he was cussed at, threats were made against his life, he was given the finger, his work area was sabotaged, doors were being slammed shut in front of him, tools were being thrown and drawers were being slammed, doors were pushed into Plaintiff, [and] derogatory comments were being made to third parties against Plaintiff." (Doc. 37-1, ¶ 8).

"Constructive discharge may occur **[\*17]** when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it." *Duffy*, 265 F.3d at 168. Notwithstanding the parade of horribles he alleged, Plaintiff has entirely failed to produce any evidence supporting these claims other than his self-serving affidavit, which is insufficient for purposes of contesting a summary judgment motion. **2⚖** *See Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."); *see also Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.").

The Plaintiff's allegations with respect to Lycoming's alleged refusal to train the Plaintiff in areas where younger employees received training suffer from the same flaws. Other than Plaintiff's own self-serving affidavit, he has presented no evidence to support that he has been denied training which resulted in the loss of an employment opportunity. **3⚖**

Finally, we turn to the Last Change Agreement, the Performance Improvement Plan, and the requirement that Plaintiff participate **[\*20]** in an Employee Assistance Program. Plaintiff, in essence, contends that these actions by Defendant Lycoming constitute disparate discipline, which is actionable under the ADEA. *See, e.g., Miller v. Aramark Healthcare Support Servs.*, 555 F. Supp. 2d 463, 467, 471 (D. Del. Jan. 14, 2008). The record amply supports Plaintiff's contention that he was subject to discipline by Defendant Lycoming.

Specifically, the record shows that Defendant's human resources director issued Plaintiff an employee disciplinary record, which is the equivalent of a verbal reprimand, on July 23, 2007. (Doc. 23, ¶ 22 (Lycoming admission of discipline); Doc. 24-6, ¶ 25 (human resources director account of discipline); Doc. 24-13 (employee discipline record)). The record further supports that on August 28, 2007, Defendant Lycoming placed the Plaintiff on a Last Chance Agreement and Performance Improvement Plan and required him to participate in an Employee Assistance Program. (Doc. 23, ¶ 26 (Lycoming admission of discipline); Doc. 24-6, ¶¶ 29-31 (human resources director account of last change agreement discipline); Doc. 24-15 (last chance agreement); Doc. 24-16 (performance improvement plan)).

Accordingly, we find **[\*21]** that the Plaintiff has proven the elements of a *prima facie* case of age discrimination: that is, Plaintiff has demonstrated to this Court that he suffered adverse employment action in the form of disciplinary action, that he was a member of the protected age group, that he was qualified for his position, and that his replacements were sufficiently younger than him to raise an inference of discrimination. This of course does not end our analysis, since Defendant Lycoming argues that its actions were unrelated to Plaintiff's age but instead a result of his nonproductive workplace behavior. However, this argument is most appropriately analyzed at the second stage of the *McDonnell Douglas* paradigm and is thus irrelevant to Plaintiff's showing of a prima facie case. *See Fasold*, 409 F.3d at 184 (citing *McDonnell Douglas*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668).

## 2. Defendant's Proffered Nondiscriminatory Reasons

We thus proceed to the second step of the *McDonnell Douglas* framework which queries whether the employer has proffered a legitimate, nondiscriminatory reason for the adverse employment action. *See Fasold*, 409 F.3d at 184. Defendant Lycoming offers two plausible reasons to support its decision to place Plaintiff **[\*22]** on the Last Chance Agreement and Performance Improvement Plan: first, the Plaintiff violated company policy by engaging in nonproductive behavior during the work day and taking actions which implicated the workplace disciplinary

provisions regarding stalking and, second, even if the Plaintiff was harassed, such behavior was unrelated to his age and was solely based on his perceived status as a union "scab" or "dissident."

In support of their first argument, that the Plaintiff had been unproductive at work and violated several workplace policies, the Defendant cites to hundreds of pages of the Plaintiff's personal notes, made while on the clock. These notes take almost minute-by-minute documentation of the actions of fellow employees during the work day. (Doc. 23, ¶ 21; Doc. 37-1, ¶ 21). The extent of this documentation fully supports the Defendant's purported concern that Plaintiff's behavior was unproductive, distracting, and bordering on stalking. The record includes extensive documentation, to the minute, of coworkers' daily activities, noting, in addition to allegedly harassing behaviors, such trivial things as coworker belching (Doc. 24-11, p.2 ("6:52 . . . S.B.-belching . . . **[\*23]** 9:20 . . . S.B. belching"), the time of day that specific coworkers would exit and enter the room (Doc. 24-11, p. 2 ("7:17-7:19 . . . C.P. break room . . . J.S. break room . . . 9:15 . . . C.P.-out of room"), and even going so far as to observe and comment upon particular employees attire. (Doc. 24-11, p. 5 ("S.B. is wearing a shirt w/ the sleeves torn off (like a muscle shift) (t-shirt).").

Plaintiff admits that he was keeping notes "almost from the start of [his] employment," although he is unsure when the Defendant learned of it. (Doc. 44, Plaintiff's Exhibit DDD, ¶ 61). The Plaintiff appears to have gone beyond documenting the behavior he found offensive and escalated to a disturbing level of observation and recording of his coworkers' behavior. Defendant Lycoming's contention that it placed Plaintiff on the Last Chance Agreement and Performance Improvement Plan because he was unproductive at work and violating policy is substantially supported by the record and Plaintiff's own admissions.

Further, Defendant Lycoming, and unknowingly, the Plaintiff himself, have presented evidence that any of the behavior directed at the Plaintiff by coworkers was entirely unrelated to the Plaintiff's **[\*24]** age but instead based on his coworkers' perception of the Plaintiff as a union breaker for crossing the picket line during a highly contested strike. (Doc. 23, ¶ 2). Plaintiff attached a ten-page addendum to his exit interview form, detailing the harassment that he endured from coworkers, however not once does he refer to age discrimination. (Doc. 43, pp. 19-25). Indeed, in Plaintiff's Charge Against Labor Organization filed with the National Labor Relations Board, he does not mention age discrimination but contends that he was treated poorly because he "was perceived as a union dissident." (Plaintiff's Exhibit WW). Specifically, Plaintiff states that the Last Chance Agreement was "in retaliation for my complaints about safety, complaints about harassment by union stewards and because I was perceived as a union dissident." (Plaintiff's Exhibit XX). As aforestated, Walter Cacko, a coworker of Plaintiff, stated in his affidavit that Plaintiff was treated this way because "[he] is a scab and [the other employees] don't like scabs." (Plaintiff's Exhibit C, ¶ 17). Plaintiff's proffered evidence is devoid of any indication, other than conclusory and unsupported allegations, that the alleged **[\*25]** harassment was a result of age discrimination.

Both of the Defendant's proffered rationales demonstrate that the alleged harassment and disciplinary action were not age related but instead related to Plaintiff's perceived status as a union dissident and his engagement in nonproductive behavior during the work day. Defendant Lycoming has offered substantial evidence to support that Plaintiff engaged in nonproductive and borderline troubling notetaking throughout the workday, resulting in his placement on the last chance agreement and performance improvement plan. (*See* Doc. 23, ¶ 21; Doc. 37-1, ¶ 21; Doc. 44, Exhibit DDD, ¶ 61; Doc. 24-11 (sample of notes)). Further, the Plaintiff's own filings with the National Labor Relations Board, statements by coworkers, and evidence presented by the Defendant indicate that any alleged harassment by coworkers was not related to the Plaintiff's age but instead based on Plaintiff's status as a union breaker. (Plaintiff's Exhibit C, ¶ 16; Exhibit TT; Exhibit WW; Exhibit XX). Both of these theories are legitimate nondiscriminatory reasons for Defendant Lycoming's actions.

Thus the burden of proof returns to the Plaintiff to demonstrate that the Defendant's **[\*26]** decision was pretextual; that is, that it was merely a facade and the true reason for his placement on the Last Chance Agreement and Performance Improvement Plan was to discriminate against him and induce him to resign because of his age. *See Fasold*, 409 F.3d at 184. The Plaintiff's burden at this point is articulated by the Third Circuit in *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994):

> A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Id.* at 764. The Plaintiff provides neither circumstantial nor direct evidence discrediting the Defendant's proof that Plaintiff was engaged in nonproductive behavior. Indeed, other than a conclusory assertion that the proffered rationals are pretextual, Plaintiff has failed to provide any evidence which persuades this Court that the Defendant's actions were predicated on Plaintiff's age.

While we are sympathetic to Plaintiff's plight relative to his coworkers, **[\*27]** and if the allegations are true, certainly disapprove of their behavior, nothing in the record establishes that the Plaintiff is entitled to judgment against Defendant Lycoming for age discrimination. It has long been established in this Circuit that "[t]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005); *see also Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."). This the Plaintiff has failed to do.

While an uncomfortable work environment is unfortunate, the same cannot in and of itself form the basis of an ADEA complaint. Indeed, as the Third Circuit has previously held, "[e]mployees are not guaranteed stress-free environments and discrimination laws cannot be transformed into a palliative for every workplace grievance, real or

imagined, by the simple expedient of quitting." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 975 (3d Cir. 1998) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)). **[*28]** The ADEA is not the proper medium for Plaintiff to air his grievances about his coworkers' perception of him as a union dissident and their associated dislike. Accordingly, Defendant Lycoming's Motion for Summary Judgment on Counts I, III, IV, and V is granted.

### 2. Union Liability

The Defendant Union contends that Plaintiff's claim against it is barred by his failure to follow grievance procedures outlined in the Collective Bargaining Agreement ("CBA"). The Union argues that, while the Plaintiff did complete the first step by verbally informing a supervisor about his concerns, he failed to present evidence demonstrating that he also complained in writing, the second grievance requirement under the CBA. The Union thus contends that Plaintiff's claim must fail because he failed to exhaust all of his remedies. Regardless of this issue, however, because we have found that no genuine issues of material fact remain with respect to the merits of the discrimination claims, the Defendant Union is entitled to judgment in its favor as a matter of law.

An employee may assert a claim for age discrimination against his or her union in certain circumstances. *See Slater v. Susquehanna Cnty.*, 613 F. Supp. 2d 653, 664, 667 (M.D. Pa. Mar. 30, 2009). **[*29]** In order to survive summary judgment and establish a prima facie case of age discrimination against the Defendant Union, Plaintiff must demonstrate that he was subjected to age discrimination, that he requested action by the union, and that the union ignored his request that they take action. *See id.* at 664 (citing *Boyer v. Johnson Matthey, Inc.*, 2005 U.S. Dist. LEXIS 171, *71 (E.D. Pa. Jan. 6, 2005); *Snyder v. Teamsters Local No. 249*, 2005 U.S. Dist. LEXIS 19055, *10 (W.D. Pa. Sept. 2, 2005)).

As a threshold matter, we note that we have already rejected Plaintiff's age discrimination claim against his employer and that he is thus unable to meet the first element of the union liability standard. However, to return to the procedural point raised by the Defendant Union, we note that in the event that age discrimination did in fact occur, Plaintiff has failed to demonstrate that he filed grievances with the Defendant Union and that the Defendant Union ignored his legitimate requests to take action. Indeed, Plaintiff stated that he assumed the Defendant Union was conspiring against him with Defendant Lycoming and thus opted *not* to file grievances. (Doc. 37-2, ¶ 10; Plaintiff's Ex. AAA, **[*30]** ¶¶ 38-39). Because the Plaintiff has failed to establish any of the elements of a union liability claim, *see Slater*, 613 F. Supp. 2d at 667, the Defendant Union's Motion for Summary Judgment on Counts II, III, IV, and V is granted.

### 3. State Law Claims

Lastly, Plaintiff has alleged several state law claims for violation of the Pennsylvania Human Relations Act, wrongful discharge, and conspiracy. We briefly address each of these claims in turn.

### A. The Pennsylvania Human Relations Act

Plaintiff, in Count VII, charges the Defendants with violation of the Pennsylvania Human Relations Act ("PHRA"). It has long been established that "Pennsylvania courts assess PHRA [claims] in accord with [their] federal counterparts." *Burgess-Walls v. Brown*, 2011 U.S. Dist. LEXIS 94087, *7 (E.D. Pa. Aug. 22, 2011) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)); *Goosby v. Johnson & Johnson Med. Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000)). Therefore, because we have found that Plaintiff has failed to state a meritorious claim under the ADEA, we likewise must conclude that Plaintiff has failed to state a viable claim for violation of the PHRA.

### B. Wrongful Discharge

In Count VI of his Complaint, Plaintiff **[*31]** asserts that the Defendants actions in creating a hostile work environment, placing him on the Last Chance Agreement, and referring him to the Employee Assistance program forced his resignation, thus effecting a wrongful constructive discharge. (Doc. 1, ¶¶ 61-64; Doc. 37, p. 14-15). As a threshold matter, we note that this Court has previously rejected such a claim as not recognized against an employee's labor union. *See Slater*, 613 F. Supp. 2d at 663 ("[The] Union cannot be liable for Plaintiff's alleged discriminatory termination because she was terminated by her employer, not by the union."). Accordingly, the wrongful discharge claim against the Defendant Union is without merit and we review the claim only as it pertains to Defendant Lycoming.

A plaintiff who brings a wrongful discharge or wrongful termination action in Pennsylvania, an at-will employment state, carries an exacting burden. The Pennsylvania Superior Court has succinctly articulated the nature and requirements of a wrongful termination action:

> Historically, Pennsylvania has recognized an employer's unfettered right to discharge an at-will employee for any or no reason in the absence of a contractual or statutory prohibition. **[*32]** That right has been tempered with the emergence of the common law doctrine of wrongful dismissal whereby an employee may premise a cause of action on either tort or contract principles.
>
> . . .
>
> . . . An essential element permitting a cause of action for wrongful discharge is a finding of a violation of a clearly defined mandate of public policy which "strikes at the heart of citizen's social right, duties, and responsibilities. The public policy exception is a narrow one.
>
> Since the wrongful discharge action first was recognized [in Pennsylvania] as cognizable . . . it is now settled law in Pennsylvania that if the discharge of an employee-at-will threatens public policy, the employee *may* have a cause of action against the employer for wrongful discharge.

*Field v. Phila. Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, 1179 (Pa. Super. Ct. 1989) (emphasis added) (quoting *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (Pa. 1974)). Thus, in order for a plaintiff to succeed on a wrongful discharge claim under the public policy exception, he must first demonstrate that his employment was terminated by an act of the defendant, and second, he must overcome the strong presumption in favor of at-will employment by demonstrating **[*33]** a violation of a "clearly defined mandate of public policy." *Id.* at 1179.

This exacting burden Plaintiff has failed to meet. Indeed, Plaintiff's arguments are markedly deficient to survive a Defendant Lycoming's Motion for Summary Judgment. The Plaintiff has failed to present any argument with respect to the wrongful discharge claim individually, but instead appears to argue the claim as an extension of the alleged PHRA violation, a cause of action we have already dismissed. While the Plaintiff's subpar efforts in this regard require no additional consideration, we note only that had he actually argued the merits of the wrongful discharge claim, we would nonetheless conclude, as we did *supra* with Plaintiff's ADEA claim, that he was neither terminated nor constructively discharged and thus entirely fails to prove a claim for wrongful discharge under Pennsylvania law. *See id.* (in addition to public policy barriers, adverse employment action, in the form of constructive discharge or termination, is a requisite element of a wrongful termination action).

## C. Conspiracy

Finally, in Count VII, Plaintiff contends that the Defendant Union met with Defendant Lycoming "at various and sundry times" **[*34]** over the course of his employment for the purpose of jointly conspiring against him to "to encourage the continuation of the problems the Plaintiff was experiencing and to force him to resign." (Doc. 1, ¶¶ 66-67). Plaintiff's only argument in support of his conspiracy claim is that because representatives of the Defendant Union were present when Plaintiff was disciplined, it necessarily must have conspired with Defendant Lycoming to discipline him. (Doc. 37, p. 15). Such a drastic inference is unsupported by the record. Indeed, as Defendant Lycoming points out, the record is entirely devoid of any evidence that the Defendant Union met or communicated with Defendant Lycoming to discuss Plaintiff whatsoever, and Plaintiff's bare assertions, speculation, and suspicions are insufficient to survive summary judgment. *See Kirleis*, 560 F.3d at 161; *Podobnik*, 409 F.3d at 594. Accordingly, we will grant the Defendants' Motions for Summary Judgment with respect to Plaintiff's conspiracy claims.

## V. CONCLUSION

In sum, the Plaintiff has altogether failed to demonstrate that the Defendant Union and Defendant Lycoming should be held liable for a constructive discharge of the Plaintiff under the ADEA **[*35]** or the PHRA, or under the common law doctrines of conspiracy and wrongful discharge. The Plaintiff has fallen woefully short of even the most minimal evidentiary mark for purposes of surviving the Defendants' collective Motions for Summary Judgment. Again, we reiterate that "[e]mployees are not guaranteed stress-free environments and discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." *Connors*, 160 F.3d at 975.

While the facts presented in the Plaintiff's argument regarding his coworkers' rude deportment are unfortunate, and if true, surely frowned upon by this Court, they do not serve to buttress his age discrimination claims against his employer or his union. Moreover, Plaintiff's self-serving affidavit, otherwise unsubstantiated, is insufficient evidence to support Plaintiff's claims and survive summary judgment. *See Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005). For all of the foregoing reasons, we find that the Plaintiff has failed to prove the existence of a genuine issue of material fact both against his employer and against his union, presenting no evidence attributing

11/13/2019          https://advance.lexis.com/documentprint/documentprintclick/?pdmfid=1000516&crid=15753b5d-3f68-472c-a5c8-fa02be75d807&ecomp…

[**36**] the alleged age discrimination to either Defendant. Therefore, we shall grant the Defendants' Motions for Summary Judgment in their entirety. An appropriate Order shall issue.

---

**Footnotes**

---

**1** Plaintiff has exhausted his administrative remedies by filing a Complaint with the Pennsylvania Human Relations Commission and cross-filing the same with the Equal Employment Opportunity Commission. He was issued a Notice of Right to Sue letter, and the instant Complaint was timely filed within ninety (90) days of receipt of said Notice.

**2** Plaintiff makes these broad and inflammatory accusations while offering no evidence, other than his own affidavit, to substantiate them. Indeed, this lack of citation and support extends to all aspects of Plaintiff's case, not merely this one point. We admonish that "[j]udges are not like pigs, hunting for truffles buried in briefs, in the universe of legal [**18**] precedent, or the record on summary judgment." *Smith v. Central Dauphin School Dist.*, 2007 U.S. Dist. LEXIS 57112, 2007 WL 2262936, *6 (M.D. Pa. Aug. 6, 2007). It is counsel's responsibility to the Court, and not the Court's independent obligation, to support Plaintiff's allegations with evidence of record. Regardless of this candidly sloppy, and frequently nonexistent, citation to the record, we note that we have conducted an independent review of the hundreds of exhibits submitted and that other than one employee's statement that he witnessed coworkers "circle the building in their car or waiting in the parking lot looking for [Plaintiff,]" (Doc. 37, Exhibit A, ¶ 10), the record does not indicate that Plaintiff's conclusory allegations are supported by testimony, affidavit, or other evidence whatsoever.

**3** Plaintiff does present the affidavit of a coworker, Mr. Edward [**19**] Bohart, Jr., which states that "I went to [a supervisor] and said that I wanted to get some basic training on the CAD modeling and he sent me for one week to Detroit, Michigan" and that "I personally know that Gary was denied the training." (Doc. 37, Ex. A, ¶ ¶ 22, 24). Plaintiff also offers the affidavit of Walter Cacko, another employee of the Defendant, which states that "Gary and I went to Detroit for training but we never received the same training that the younger employees got." (*Id.*, Ex. C, ¶ 19). Even viewing all evidence in favor of Plaintiff, this evidence alone, viewed in the context of the entire record, does not demonstrate that the Plaintiff suffered an adverse employment action recognized by the ADEA. Plaintiff has failed to establish that he was terminated, demoted, denied a promotion, falling behind, or even that he was less skilled than other employees. Plaintiff's bare assertion that he was "denied an employment opportunity" because he was less skilled and insufficiently trained in comparison to younger employees is thus entirely unsupported.

---

**Content Type:** Cases

**Terms:** 2012 us dist lexis 59957

**Narrow By:** -None-

**Date and Time:** Nov 13, 2019   06:17:36 p.m. EST



About
LexisNexis®

Privacy
Policy

Terms &
Conditions

Sign
Out

Copyright
© 2019
LexisNexis.
All rights
reserved.





Lexis Advance®
Research

**Document:** Brosky v. MJC Indus., 2016 Pa. Dist. & Cnty. Dec. LEXIS 1127

---

# Brosky v. MJC Indus., 2016 Pa. Dist. & Cnty. Dec. LEXIS 1127

Copy Citation

Common Pleas Court of Bucks County, Pennsylvania

August 4, 2016, Decided

No. 2013-03355

**Reporter**

**2016 Pa. Dist. & Cnty. Dec. LEXIS 1127 ***

WILLIAM AARON BROSKY v. MJC INDUSTRIES, INC.

**Subsequent History:** Affirmed by Brosky v. MJC Indus., 2017 Pa. Super. Unpub. LEXIS 2043 (May 24, 2017)

**Prior History:** Brodsky v. MJC Indus., 122 A.3d 451, 2015 Pa. Super. Unpub. LEXIS 1415 (May 18, 2015)

## Core Terms

transferred, indispensable party, properties, parties, Landscaping, Deposition, transfer of property, summary judgment motion, fraudulent transfer, fraudulent, matter of law, insolvent, equivalent value, summary judgment, cause of action, transferor, easement, cabin, genuine issue of material fact, court erred, estimated, Matters, deed, line of credit, rights, incur, grant summary judgment, time of transfer, oral argument, trial court

## Case Summary

### Overview

HOLDINGS: [1]-In support of an affirmance on appeal under Pa.R.A.P. 1925(a), the court noted that it properly granted partial summary judgment to a judgment creditor, wherein he sought to enforce an underlying civil judgment that arose from the debtor's prior sexual assault of the creditor, as there were no disputed facts regarding the debtor's fraudulent transfers of his property under 12 Pa.C.S. §§ 5104(a)(2)(ii) and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act; [2]-The creditor sufficiently established that

the claim, as defined in 12 Pa.C.S. § 5101, arose at the time of the sexual abuse which was before the property transfers, that the debtor did not receive reasonably equivalent value for the transfers and should have reasonably believed he would incur debts beyond his ability to pay, and he became insolvent due to the transfers.

### Outcome

Affirmance recommended.

---

▼ LexisNexis® Headnotes

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾

Civil Procedure > Appeals ▾ > Summary Judgment Review ▾ > Standards of Review ▾

**HN1** Standards of Review, De Novo Review
The scope of review of an order granting or denying summary judgment is plenary. 🔍 More like this Headnote

Shepardize - Narrow by this Headnote

Civil Procedure > Appeals ▾ > Standards of Review ▾ > Abuse of Discretion ▾

Civil Procedure > Appeals ▾ > Summary Judgment Review ▾ > Standards of Review ▾

Civil Procedure > ... > Summary Judgment ▾ > Entitlement as Matter of Law ▾ > Legal Entitlement ▾

**HN2** Standards of Review, Abuse of Discretion
The well-established standard of review from a summary judgment ruling demonstrates that the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. Under Pa.R.C.P. No. 1035.2, summary judgment may be rendered as a matter of law. 🔍 More like this Headnote

Shepardize - Narrow by this Headnote

Civil Procedure > ... > Summary Judgment ▾ > Entitlement as Matter of Law ▾ > Appropriateness ▾

Civil Procedure > ... > Summary Judgment ▾ > Entitlement as Matter of Law ▾ > Genuine Disputes ▾

Civil Procedure > ... > Summary Judgment ▾ > Burdens of Proof ▾ > Movant Persuasion & Proof ▾

**HN3** Entitlement as Matter of Law, Appropriateness
Summary judgment is appropriate when the moving party establishes that the case is free and clear of doubt, that there are no genuine issues of material fact, and the moving party is entitled to relief as a matter of law. The function of the court is to examine the record in the light most favorable to the non-moving party and accept as true all well-pleaded facts in the pleadings together with all reasonable inferences there from favoring the non-moving party. The burden is on the moving party, but it has long been recognized that summary judgment should be granted to the movant unless the opposing party offers competent evidence,

which would be admissible at trial, showing that there is a genuine issue as to a material fact that would warrant submitting the case to the trier of fact. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

**HN4**⬇ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. § 5104 provides several alternatives for finding a transfer fraudulent. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

**HN5**⬇ **Enforcement & Execution, Fraudulent Transfers**
Although 12 Pa.C.S. § 5104(a) allows for claims that arose before or after an allegedly fraudulent transfer, 12 Pa.C.S. § 5105 requires that the claim have arisen before the transfer. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

**HN6**⬇ **Enforcement & Execution, Fraudulent Transfers**
A "creditor" is a person who has a claim and a "debtor" is a person who is liable on a claim. 12 Pa.C.S. § 5101. A "claim" is generally defined as a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. § 5101(b). Legal liability, when read together with the word claim, cannot mean only liability which exists after a verdict following a trial. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

**HN7**⬇ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. §§ 5104(a) and 5105 require that the allegedly fraudulent transfers be made by a debtor that does not receive reasonably equivalent value. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Business & Corporate Compliance > ... > Contracts Law ▼ > Contract Formation ▼ > Consideration ▼

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

**HN8**⬇ **Contract Formation, Consideration**
Consideration in the form of a promise to support a grantor in the future is invalid if by the conveyance the grantor renders himself unable to pay his debts, the theory being that a conveyance whereby a debtor puts his property beyond the reach of his creditors under an agreement that it shall be devoted in any way to his own use is constructively fraudulent. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Business & Corporate Compliance > ... > Contract Formation ▾ > Consideration ▾ > Adequate Consideration ▾

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

**HN9**⚓ **Consideration, Adequate Consideration**
Assumption of a mortgage or other encumbrance on a property by a grantee could be regarded as "fair consideration" as it gives a benefit to the grantor, such as for a fraudulent transfer analysis. However, the court must consider the entire fabric of the dealings between the parties. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

**HN10**⚓ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. § 5104(a)(2)(ii) requires that the debtor have believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

Evidence > Burdens of Proof ▾ > Allocation ▾

Evidence > Inferences & Presumptions ▾ > 📄 Presumptions ▾ > Effects ▾

**HN11**⚓ **Enforcement & Execution, Fraudulent Transfers**
Similar to 12 Pa.C.S. § 5104's requirement that the debtor believed or reasonably should have believed he would incur debts beyond his ability to pay as they became due, 12 Pa.C.S. § 5105 requires that the debtor was insolvent at the time of the transfer or the debtor became insolvent as a result of the transfer. A debtor is insolvent if at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets. 12 Pa.C.S. § 5102(a). Further, a debtor is presumed to be insolvent where the debtor is generally not paying the debtor's debts as they become due. This presumption shall impose on the party against whom the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence. § 5102(b). 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

Governments > Legislation ▾ > Statute of Limitations ▾ > Time Limitations ▾

**HN12**⚓ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. § 5109(2) of the Pennsylvania Uniform Fraudulent Transfer Act provides that a cause of action with respect to a fraudulent transfer is extinguished unless the action is brought under 12 Pa.C.S. §§ 5104(a)(2) or 5105 (relating to transfers fraudulent as to present creditors), within four years after the transfer was made or the obligation was incurred. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Burdens of Proof ▾

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Laches ▾

**HN13**⚓ **Affirmative Defenses, Burdens of Proof**
The equitable defense of laches requires not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

---

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

Evidence > Burdens of Proof ▼ > Allocation ▼

Civil Procedure > Remedies ▼ > Damages ▼ > Monetary Damages ▼

**HN14**⬇ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. § 5107 provides various remedies available to creditors if a transfer is proved fraudulent. These include avoidance of the transfer, attachment of the asset, injunction against further disposition by a debtor or transferee, appointment of a receiver, and any other relief the circumstances may require. 12 Pa.C.S. § 5108(b) and (c) permit the recovery of a judgment for the value of an asset(s) transferred against the first transferee of the asset. Furthermore, the Pennsylvania Uniform Fraudulent Transfer Act under § 5107(a)(3)(iii) provides the court with the discretion to award any relief the circumstances require. Section 5108(c) states that a money judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

---

Civil Procedure > Dismissal ▼ > Involuntary Dismissals ▼ > Failure to State Claims ▼

Civil Procedure > ... > Joinder of Parties ▼ > Compulsory Joinder ▼ > Indispensable Parties ▼

**HN15**⬇ **Involuntary Dismissals, Failure to State Claims**
Pa.R.C.P. No. 1032 dictates that whenever it appears by suggestion of the parties or otherwise that there has been a failure to join an indispensable party, the court shall order that the indispensable party be joined, but if that is not possible, then it shall dismiss the action. Generally, a court will find that a party is indispensable to an equity action when he has such an interest that a final decree cannot be made without affecting it, or leaving the controversy in such a condition that a final determination may be wholly inconsistent with equity and good conscience. That is to say, his presence as a party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

---

Civil Procedure > ... > Joinder of Parties ▼ > Compulsory Joinder ▼ > Indispensable Parties ▼

Evidence > Burdens of Proof ▼ > Allocation ▼

**HN16**⬇ **Compulsory Joinder, Indispensable Parties**
The Pennsylvania Supreme Court has offered at least four factors that a court should consider before making a determination as to the existence of an indispensable party. These include: (1) whether an absent party has a right/interest related to the claim; (2) identifying that right/interest; (3) establishing whether that right/interest is essential to the merits of the case; and (4) ensuring that justice can be done without violating the due process rights of the absent party. All these considerations are themselves conclusions of law to be made by the court after due consideration. Bare factual allegations of a party are not dispositive for the issues underlying the indispensable party question. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

---

Civil Procedure > ... > Joinder of Parties ▼ > Compulsory Joinder ▼ > Indispensable Parties ▼

**HN17**⬇ **Compulsory Joinder, Indispensable Parties**
To establish whether a right or interest is essential to the merits of the case for purposes of an indispensable party analysis under Pa.R.C.P. No. 1032, a court is required to conduct a further inquiry. An absent party's asserted right must be "so essential to the merits of the question," such that it must be so much affected by

the decree, that the court cannot proceed to a final decision of the cause, until they are parties. The Pennsylvania Supreme Court has further interpreted this question of essentialness to revolve around the directness of the connection between the asserted right and the particular case. An indispensable party is one whose rights are so directly connected with and affected by litigation that he must be a party of record to protect such rights, and his absence renders any order or decree of court null and void for want of jurisdiction. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Contracts Law > Contract Interpretation ▾

Contracts Law > Contract Interpretation ▾ > Intent ▾

**HN18** ⚓ **Contracts Law, Contract Interpretation**
Pennsylvania law regarding contract interpretation is well-settled as follows: The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the, writing itself. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

Civil Procedure > ... > Joinder of Parties ▾ > Compulsory Joinder ▾ > Indispensable Parties ▾

**HN19** ⚓ **Enforcement & Execution, Fraudulent Transfers**
The transferor in a fraudulent transfer action has no interest in transferred property after completion of the transfer, such as for an indispensable party analysis. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

Civil Procedure > ... > Joinder of Parties ▾ > Compulsory Joinder ▾ > Indispensable Parties ▾

**HN20** ⚓ **Enforcement & Execution, Fraudulent Transfers**
12 Pa.C.S. § 5107 clearly authorizes a creditor to seek damages from the original transferor or the transferee or the asset transferred. The statute does not mandate that a transferor must be named in a recovery action, and on its face, seems to suggest otherwise. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > Judgments ▾ > Enforcement & Execution ▾ > 📄 Fraudulent Transfers ▾

Civil Procedure > ... > Joinder of Parties ▾ > Compulsory Joinder ▾ > Indispensable Parties ▾

**HN21** ⚓ **Enforcement & Execution, Fraudulent Transfers**
Comment (4) to 12 Pa.C.S. § 5107 reads that under the Uniform Fraudulent Conveyance Act, a creditor is not required to obtain a judgment against the debtor-transferor or to have a matured claim in order to proceed under § 5107(a). If a transferor were a necessary party to a fraudulent transfer action, it would be superfluous for the legislature to authorize a creditor to proceed without a judgment against a party that must be joined in the underlying action. By allowing a creditor to proceed under the Act without obtaining a prior judgment against the transferor, the legislature asserts that such a party is not indispensable to the action. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Business & Corporate Law > ... > Shareholder Actions ▼ > Actions Against Corporations ▼ > 📄

Direct Actions ▼

Civil Procedure > Judgments ▼ > Enforcement & Execution ▼ > 📄 Fraudulent Transfers ▼

Civil Procedure > ... > Joinder of Parties ▼ > Compulsory Joinder ▼ > Indispensable Parties ▼

**HN22**⬇ **Actions Against Corporations, Direct Actions**
In order to be essential in a fraudulent transfer action, a party's right must be so directly connected with and affected by litigation that he must be a party of record to protect such rights. An injury to a corporation may, to be sure, result in injury to the corporation's stockholders. Such injury, however, is regarded as "indirect," and insufficient to give rise to a direct cause of action by the stockholder. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > ... > Joinder of Parties ▼ > Compulsory Joinder ▼ > Indispensable Parties ▼

**HN23**⬇ **Compulsory Joinder, Indispensable Parties**
Essentialness for purposes of an indispensable party analysis under Pa.R.C.P. No. 1032 necessarily involves the interest in question being so directly connected to the case that the party must be present to protect those interests. 🔍 More like this Headnote

*Shepardize* - Narrow by this Headnote

**Counsel:** **[*1]** Robert J. Bush, Esquire, Robert J. Bush & Associates, West Chester, PA, Counsel for Appellant.

Christopher P. Coval ▼, Esquire, Fenningham, Stevens, Dempster & Coval LLP ▼, Willow Grove, PA, Counsel for Appellee.

**Judges:** WALLACE H. BATEMAN, JR. ▼, J.

**Opinion by:** WALLACE H. BATEMAN, JR. ▼

## Opinion

CIVIL ACTION — LAW

MJC Industries, Inc. (hereinafter "Appellant") has appealed this Court's June 21, 2016 Order Withdrawing Counts I, IV, and V of William Aaron Brosky's (hereinafter "Appellee") Complaint 1⬇. Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), we file this Opinion in support of this Court's ruling.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts of this case were detailed in this Court's prior Opinion, dated June 30, 2014, and are set forth herein:

> In 2001, Appellee was approximately twelve (12) years old when he met Michael Mesko. Sometime thereafter, Mesko became sexually involved with Appellee. Appellee eventually reported these incidents leading to Mesko's arrest by the **[*2]** Allentown Police Department in February 2010. Mesko was charged with involuntary deviate sexual intercourse pursuant to 18 Pa. C.S. § 3123. On October

13, 2010, Mesko pled guilty to this charge and was sentenced to 5-15 years of incarceration. *Appellee's Complaint*, ¶¶ 3-7; *Appellant's Answer*, ¶¶ 3-7.

Prior to his incarceration, Mesko owned and operated a landscaping business, Mesko Landscaping, Inc., which used for its operations certain real estate owned by Mesko personally. On October 12, 2010, the day before Mesko's guilty plea, he signed a deed transferring his fee simple ownership of real property located at 3268 Route 212, Springtown, PA 18081 (hereinafter "the Route 212 property") to Appellant, MJC Industries, Inc., in exchange for $1.00. *Appellee's Complaint*, Ex. A. In addition, on the same date, Mesko signed a deed transferring his ownership of approximately 36 acres of real estate located at 1515 Woodcock Road, Kintnersville, PA 18930 (hereinafter "the Woodcock Road property") to Appellant in exchange for $1.00. *Appellee's. Complaint*, Ex. B. Mesko also transferred stock in Mesko Landscaping, Inc. to Glenn Jackson, CEO of Appellant, MJC Industries, Inc. *Mesko Deposition Transcript* (unlabeled **[*3]** exhibit to Appellee's Motion for Summary Judgment), pp. 54-57. Other than the assets transferred, Mesko only retained a cabin in the Poconos, which he valued between $25,000 and $40,000. This cabin was subsequently sold at sheriff's sale because Mesko was unable to pay the real estate taxes thereon. Mesko admitted that he did not retain any other valuable assets. *Mesko Deposition Transcript*, pp. 64-65. The 1515 Woodcock Road property was unencumbered by any mortgage, tax lien or other liability at the time of transfer. Both Mesko and Jackson admitted that they believed the value of this property was approximately $200,000. Appellee's appraiser valued the property to be $250,000 in October 2010. The 3268 Route 212 property was encumbered by a $200,000 line of credit. Appellee's appraiser valued this property to be $265,000 in October 2010. *Appellee's Motion for Summary Judgment*, ¶¶ 34-35.

On April 1, 2011, Appellee filed a civil suit against Mesko in the Lehigh County Court of Common Pleas, Docket No. 2011-C-1300, which resulted in a stipulated judgment against Mesko in the principal amount of $500,000.00. The judgment was indexed in the Lehigh County Court of Common Pleas on December **[*4]** 14, 2012. *Appellee's Complaint* ¶¶ 11-12; *Appellant's Answer*, ¶¶ 11-12.

On May 13, 2013, Appellee filed the instant action in order to collect upon said judgment. At the time this suit was brought, Appellee had not collected any sum towards the $500,000 judgment. On June 26, 2013, Appellant filed an Answer to Appellee's Complaint. Thereafter, the parties engaged in discovery, and various motions and responses were filed by the parties. On December 26, 2013, Appellee filed a Motion for Summary Judgment claiming that the allegations of the Complaint were uncontroverted and therefore, no genuine issue of material fact existed. On January 28, 2013, Appellant filed his Response to Appellee's Motion for Summary Judgment as well as a "Motion to Dismiss Complaint with Prejudice for Failure to Join Indispensable Party and Lack of Jurisdiction." The parties filed additional supporting memoranda thereafter.

Trial Court Opinion, 06/30/14, pp. 1-3.

This Court granted Appellee's Motion for Summary Judgment on February 20, 2014. Appellant filed an initial Notice of Appeal to Superior Court in response to our Order, and this Court's Opinion in support of our Order was docketed on July 2, 2014. On May **[*5]** 18, 2015, Superior Court filed a Memorandum Opinion quashing Appellant's Appeal due to lack of jurisdiction, remanding the case for this Court to make an express determination as to whether an indispensable party was absent from the litigation, as well as to resolve Plaintiff's remaining claims that our partial summary judgment Order did not specifically address.

On June 30, 2015, Appellant filed a "Motion to Vacate Order Granting Summary Judgment and Rule on Superior Court's Order of Remand and Instruction to Rule on Defendant MJC's Motion to Dismiss for Failure to Name Indispensable Parties." This Court heard oral argument on said Motion on July 22, 2015, whereupon we ordered both parties to brief their arguments. Upon the arguments presented at oral argument and a review of the filings of record and the allegations therein, we determined that Appellant's Motion was without merit and issued an Order denying the Motion on September 14, 2015.

Appellant filed a Notice of Appeal of this Court's Order on October 8, 2015, however, Superior Court Quashed the Appeal *sua sponte* as it was interlocutory in light of the fact that Counts I, IV, and V of Appellee's Complaint were still undecided. **[*6]** Appellee filed a Praecipe to Withdraw said Counts on June 9, 2016, which this Court granted in a June 21, 2016 Order. Appellant filed a timely Notice of Appeal from that Order to the Superior Court on July 5, 2016.

**STATEMENT OF MATTERS COMPLAINED OF ON APPEAL**

On July 7, 2016, this Court issued an Order pursuant to Pa.R.A.P. §1925(b) requiring Appellant to file a Concise Statement of Errors Complained of on Appeal no later than twenty-one (21) days after entry of the Order. Appellant filed such a Statement on July 26, 2016, which raised the following issues, *verbatim*:

    1. The court erred as a matter of law in failing to Vacate its' [sic] Order Granting Summary Judgment, after remand by the Superior Court, by failing to recognize or appreciate the fact that material issues of fact are disputed and that there are issues to present to the jury regarding the consideration for the transfer of the real property in question as pointed out by the Superior Court in its' [sic] Opinion.

2. The court erred as a matter of law in violating the rule that the "Court is not to decide issues of fact when resolving a motion for summary judgment, but merely to determine whether any such issues exist". [sic]

3. The court erred **[*7]** as a matter of law when it failed to recognize that genuine issues of material facts in dispute are established by the depositions of the parties to the transaction that is the core issue that, as plaintiff avers, is subject to the Fraudulent Transfer Act. Thus [sic] despite being presented with the actors [sic] testimony from depositions [sic] which clearly indicate a legitimate and necessary complex transaction between the parties that included critical non-monetary consideration to support said transaction [sic] the court ignored these factors in determining that there are no issues of material fact thus [sic] granting the Motion for Summary Judgment.

4. The court erred as a matter of law in granting summary judgment in that it failed to consider the defense that there is a genuine issue of material fact because the cause of action is dependent upon the credibility and demeanor of the witnesses who will testify at trial. By granting Summary Judgment [sic] the trial court ailed to allow a jury to draw their conclusions from testimony as given.

5. The court erred as a matter of law and fact in ignoring and failing to address or consider the clear defense of Latches [sic] presented by **[*8]** the defendant. Latches constituted a separate defense from the alleged failure of consideration by the court. The question of latches [sic] presents a separate avenue of a genuine issue of material fact that is sufficient to defeat a motion for summary judgment independent of the other issues presented.

6. The trial court erred as a matter of law in that it ruled on the Motion for Summary Judgment despite having no jurisdiction over the matter. The plaintiff failed to name as a party the individual who owned the properties that are alleged to have been fraudulently transferred. Thus, an essential absent party who has a right or interest related to the claim of the cause of action remains an unnamed party and therefore [sic] the court was deprived of jurisdiction.

7. The court erred as a matter of law in that it ruled on a Motion for Summary Judgment despite having no jurisdiction over the matter, due to the fact that The [sic] plaintiff failed to name as a party the individual who was the sole shareholder of the defendant company, Glenn Jackson, to whom the properties were transferred and, who had invested in the properties that are alleged to have been fraudulently transferred, prior **[*9]** to the transfer.

8. The court erred as a matter of law in that it ruled on a Motion for Summary Judgment despite having no jurisdiction over the matter, due to the fact that The [sic] plaintiff failed to name as a party the Company, Mesko Landscaping, Inc., which was an essential party to the litigation in that the company stores over $400,000 in inventory, ie. [sic] Trees [sic] needed for its' [sic] business, on the property. Thus, another essential absent party who has a tight or interest related to the claim of the cause of action remains an unnamed party and therefore [sic] the court was deprived on jurisdiction.

9. The trial court erred as a matter of law in its failure to name essential parties to the action, to wit: the transferor, Michael Mesko; the individual stockholder of the transferee, Glenn Jackson; and the corporation, Michael Mesko, Inc., which uses the property transferred and acquired by the Plaintiff for storage of its' [sic] inventory, to wit: trees planted for landscaping purposes. As a result of failing to name indispensable parties, the court lacked jurisdiction over the matter and the Motion to Dismiss should have been granted.


## ANALYSIS


### I. This Court appropriately **[*10]** granted partial summary judgment given that there existed no genuine issue of material fact. 2 ⚓


#### A. Summary Judgment Standard

*HN1*⚓ The scope of review of an order granting or denying summary judgment is plenary. Universal Teleservices, Arizona, LLC v. Zurich American Ins. Co., 2005 PA Super 234, 879 A.2d 230, 232 (Pa. Super. 2005). *HN2*⚓ The well-established standard of review demonstrates that "the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion." Universal Health Services, Inc. v. PIGA, 2005 PA Super 330, 884 A.2d 889, 892 (Pa. Super. 2005). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." Chaney v. Meadville Medical Center, 2006 PA Super 295, 912 A.2d 300, 306 (Pa. Super. 2006) (citing **[*11]** Harman v. Borah, 562 Pa. 455, 756 A.2d 1116, 1123 (Pa. 2000)).

Under Pennsylvania Rule of Civil Procedure 1035.2, summary judgment may be rendered as a matter of law:

(1) whenever there is no genuine issue of material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report; or

(2) if after the completion of discovery relevant to the motion ... an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

*HN3* Summary judgment is appropriate when the moving party establishes that the case is free and clear of doubt, that there are no genuine issues of material fact, and the moving party is entitled to relief as a matter of law. Summers v. Certainteed Corp., 606 Pa. 294, 997 A.2d 1152 (Pa. 2010). The function of the Court is to examine the record in the light most favorable to the non-moving party and accept as true all well-pleaded facts in the pleadings together with all reasonable inferences there from favoring the non-moving party. Ryan v. Asbestos Corp. Ltd., 2003 PA Super 239, 829 A.2d 686 (Pa. Super. 2003). The burden is on the moving party, but it has long been recognized that summary judgment should be granted to the movant unless the opposing party offers competent evidence, which would be admissible [*12] at trial, showing that there is a genuine issue as to a material fact that would warrant submitting the case to the trier of fact. Community Medical Services of Clearfield, Inc. v. Local 2265, AFSCME, 292 Pa. Super. 238, 437 A.2d 23, 27 (Pa. Super. 1981).

## B. Summary Judgment was Appropriately Granted

Appellant's Statement of Matters Complained of numbers 1 through 5 all pertain to this Court's grant of summary judgment to Appellee on Counts II and III of Appellee's Complaint. Therefore, we discuss these matters jointly herein. This Court neither erred as a matter of law nor abused its discretion in granting summary judgment in favor of Appellee because no material facts are at issue.

Count II of the Complaint alleges that the transfers of 3268 Route 212 and 1515 Woodcock Road (hereinafter "the properties") to Appellant were fraudulent transfers pursuant to Pennsylvania's Uniform Fraudulent Transfer Act ("UFTA"), 12 Pa.C.S. §5104. *HN4* Section 5104 provides several alternatives for finding a transfer fraudulent. Appellee raised his claim under 12 Pa.C.S. §5104(a)(2)(ii) which states:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation, and [*13] the debtor . . . intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. 3⬇

Count III of the Complaint alleges that the transfers were fraudulent pursuant to UFTA, 12 Pa.C.S. §5105. Similarly,

Section 5105 provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

No genuine issue of material fact was present as to any of the elements required by 12 Pa.C.S. §5104(a)(2)(ii) or 12 Pa.C.S. §5105.

## 1.) Appellee's Claim Arose Before the Transfers

*HN5* Although Section 5104(a) allows for claims that arose before or after an allegedly fraudulent transfer, Section 5105 requires that the claim have [*14] arisen before the transfer. In this case, Appellee's claim arose at the time of the conduct which led to the liability, Mesko's sexual acts with Appellee. These acts occurred well before the transfer of the properties.

*HN6* A "creditor" is a "person who has a claim" and a "debtor" is a "person who is liable on a claim." 12 Pa.C.S. §5101. A "claim" is generally defined as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 12 Pa.C.S. §5101(b). Legal liability "when read together with the word Claim, . . . cannot mean only liability which exists after a verdict following a trial." Baker v. Geist, 457 Pa. 73, 321 A.2d 634, 636-37 (Pa. 1974). In Baker, liability was based on the debtor's conduct, her negligence in a motor vehicle collision, which occurred before the alleged fraudulent transfers. Although a jury verdict was obtained against debtor subsequent to the alleged fraudulent transfers, the Court found that a claim arose before the transfers. See id.; see also Melat v. Melat, 411 Pa. Super. 647, 602 A.2d 380, 386 (Pa. Super. 1992).

The creditor in this case was Appellee Brosky, who had obtained a $500,000.00 judgment by stipulation in the Lehigh County Court of Common Pleas. The judgment was obtained against [*15] the debtor, Michael Mesko, and

was indexed on the docket on December 14, 2012. The transfer of the properties occurred more than two (2) years prior, on October 12, 2010. Similar to the Baker case, although Appellee did not obtain the stipulated judgment until December 2012, Mesko's conduct from approximately 2001 until sometime before February 2010, when he was arrested, established Appellee as a creditor with a claim against Mesko well before the October 2010 transfers. Thus, this element is satisfied under both Sections 5104(a)(2) and 5105.

**2.) Mesko did not Receive Reasonably Equivalent Value**

*HN7* Sections 5104(a) and 5105 require that the allegedly fraudulent transfers be made by a debtor that does not receive reasonably equivalent value. There is no genuine issue of fact that Appellant failed to provide reasonably equivalent value to Mesko in exchange for the properties.

First, we look to the instruments transferring ownership of the properties from Mesko to Appellant, MJC Industries, Inc. The second paragraph of the instrument transferring ownership of the Route 212 property states that "the said Grantor(s) for and in consideration of the sum of One Dollar ($1.00) lawful money of the United States of America . . . has granted **[*16]** . . . unto the said Grantee(s), its'/his/her/their heirs and Assigns." Appellee's Complaint, Ex. A. On the first page of the instrument which purports to convey the Woodcock Road property, it states "[t]hat in consideration of the sum of One ($1.00) Dollar, in hand paid, . . . the said Grantor does hereby grant and convey to the said Grantee . . . ." Appellee's Complaint, Ex. B. Mesko admits that he was paid $1.00 by Appellant. Mesko Deposition Transcript, pp. 30-31.

Appellant argued that additional consideration, not named in the deeds, was provided to Mesko in exchange for the properties. We shall address each claim of additional consideration individually. Moreover, we note that the Woodcock Road property was appraised by Appellee to have equity in the amount $250,000 at the time of transfer. Further, the 3268 Route 212 property was appraised to have equity in the amount of $265,000 and was subject to a $200,000 line of credit, leaving equity of approximately $65,000.

In First Nat. Bank of Marietta v. Hoffines, the Pennsylvania Supreme Court rejected the contention that past services rendered by a wife to her husband over several years constituted "fair consideration." See First Nat. Bank of Marietta v. Hoffines, 429 Pa. 109, 239 A.2d 458, 463 (1968); see also Coscia v. Hendrie, 427 Pa. Super. 585, 629 A.2d 1024, 1027 (Pa. Super. 1993). **[*17]** The case at hand presents very similar circumstances. Appellant argues that Glenn Jackson, Appellant's CEO, had invested several years of time, money and effort into the operation of Mesko Landscaping, Inc., the landscaping company Mesko and Jackson, neighbors and family friends, were jointly involved in. The company was later transferred to Jackson in addition to the properties. Appellant claims the parties deemed these past services rendered as part of the purchase price instead of repayment and salary for the years of work Jackson provided. First, we note that the conveyance documents never mentioned Jackson's past services. Appellee's Complaint, Ex. A and B. Further, Jackson stated that he did not keep track of the hours he worked for the landscaping company, and could not provide an hourly rate for his services. Jackson Deposition Transcript (unlabeled exhibit to Appellee's Motion for Summary Judgment), p. 38. Appellant failed to provide sufficient evidence to support that reasonably equivalent value was provided in the form of services for these properties, estimated to be worth $250,000 and $265,000.

Appellant next claimed that Jackson guaranteed Mesko employment and a place **[*18]** to live upon his release from prison, and that Mesko received an option to buy back all or part of the business at the time he was released. Jackson Deposition Transcript, p. 39, lines 13-23. Appellant claims this as additional consideration to support the property transfers. However, *HN8* consideration in the form of a promise to support a grantor in the future is invalid "if by the conveyance the grantor renders himself unable to pay his debts, the theory being that a conveyance whereby a debtor puts his property beyond the reach of his creditors under an agreement that it shall be devoted in any way to his own use is constructively fraudulent." Commonwealth. v. Smith, 344 Pa. 381, 25 A.2d 694, 696 (Pa. 1942); see also Com. Trust Co. of Pittsburgh v. Cirigliano, 352 Pa. 108, 41 A.2d 863, 864-65 (Pa. 1945) (Pennsylvania Supreme Court held that a son promising to support his mother for the rest of her life was invalid consideration). Assuming Appellant's statements are true, Mesko, the grantor, rendered himself unable to pay his debts by making the transfers, and the transfers were devoted to his own future use and benefit. This would be constructively fraudulent.

Appellant further argues consideration in the form of a conservation easement on the Route 212 property assumed by Appellant as part of the transfer. The Conservation Easement **[*19]** is noted on the deed, which states that the easement "runs with the land and . . . was granted to Heritage Conservancy." Appellee's Complaint, Ex. B. This easement was given in exchange for $204,000, which was deposited into the business checking account of Mesko Landscaping, Inc., a company whose assets were also acquired by Glenn Jackson, CEO of Appellant, MJC. Industries, Inc. Mesko Deposition Transcript, pp. 22-25. Appellant fails to state how an easement that runs with the land and is assumed by a grantee would constitute reasonably equivalent value. Appellant merely states that the easement prevented any development on the land. In addition, Appellant's CEO possessed the business account in which the proceeds from the grant of the easement were deposited. Appellant failed to present any evidence to suggest the easement on the land constituted valuable consideration.

Finally, Appellant argues that its assumption of a $200,000 line of credit on the Route 212 property constituted reasonably equivalent value. We first note that Appellee's estimate, the only estimate submitted to this Court for this property, was $265,000. Further, the Woodcock Road property, estimated to be worth **[*20]** $250,000, was unencumbered. *HN9* Assumption of a mortgage or other encumbrance on a property by a grantee could be regarded as "fair consideration" as it gives a benefit to the grantor. See Cont'l Bank v. Marcus, 242 Pa. Super. 371, 363 A.2d 1318, 1320-21 (Pa. Super. 1976). However, the Court must consider the entire fabric of the dealings

between the parties. Id. First, the line of credit and the encumbrance on the property was in the amount of $200,000, whereas the property was estimated to be worth $265,000, rendering a significant $65,000 of equity obtained by Appellant for essentially no additional consideration as discussed above. Further, Mesko stated that some of the proceeds from the grant of the conservation easement were used to pay down the line of credit. He estimated approximately $50,000 was used for this purpose. Mesko Deposition Transcript, pp. 22-24. Thus, the equity in the property acquired by Appellant is likely higher than $65,000. Moreover, both properties were transferred from Mesko to Appellant on exactly the same day, October 12, 2010, the day before he pled guilty to his criminal charge. The Woodcock Road property, estimated to be worth $250,000, was unencumbered, and therefore acquired along with the 3268 Route 212 property for essentially nothing. **[*21]** These two properties hastily transferred to Appellant the day before Mesko's guilty plea had a combined value of $515,000. Therefore, viewing the entirety of the dealings between the parties, there can be no doubt that reasonably equivalent value was not provided by Appellant even assuming the $200,000 line of credit constitutes consideration. Thus, reasonably equivalent value was not provided to Mesko, satisfying the element required by Sections 5104(a) and 5105.

### 3.) Mesko Reasonably Should Have Believed He would Incur Debts Beyond His Ability to Pay

**HN10** 12 Pa.C.S. §5104(a)(2)(ii) requires that the debtor have "believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

First, Mesko made the transfers of the property the day before he was pleading guilty to a criminal charge that ultimately led to his imprisonment for a term of 5-15 years. A reasonable person in Mesko's circumstances would have believed that he faced potential civil liability to the victim of his crimes. Appellee initiated his civil suit in April 2011, approximately six months after Mesko's guilty plea and two months after his incarceration.

Furthermore, Mesko stated that he had no savings accounts **[*22]** and last had a checking account prior to his incarceration in February 2011. This checking account was transferred to Appellant. Mesko Deposition Transcript, pp. 8-9, 25. Additionally, after the transfer of the properties to Appellant, Mesko was left with only a cabin located in Pike County. Mesko Deposition Transcript, pp. 64-65. Aside from the debts Mesko reasonably could have believed he would incur from the victim of his crimes, Mesko also had taxes and other fees associated with the cabin which was still retained in his name. Nonetheless, Mesko retained no bank accounts nor any interest in his landscaping business. Thus, Mesko either knew or reasonably should have believed that he would be unable to pay these costs associated with the cabin. In fact, the cabin was ultimately sold at sheriff's sale because Mesko failed to pay the property taxes. Mesko Deposition Transcript, p. 65.

Therefore, Mesko reasonably should have believed that he would incur debts beyond his ability to pay as they became due, and nonetheless, he made the property transfers to Appellee, satisfying this element of Section 5104(a)(2)(ii).

### 4.) Mesko Became Insolvent as a Result of the Transfers

**HN11** Similar to Section 5104's requirement that the debtor **[*23]** believed or reasonably should have believed he would incur debts beyond his ability to pay as they became due, 12 Pa.C.S. §5105 requires that the debtor was insolvent at the time of the transfer or the debtor became insolvent as a result of the transfer. "A debtor is insolvent if at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa.C.S. §5102(a). Further, a debtor is presumed to be insolvent where the debtor "is generally not paying the debtor's debts as they become due . . . . This presumption shall impose on the party against whom the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence." 12 Pa.C.S. §5102(b).

Mesko's debts included his personal liability to Appellee, a $500,000 stipulated judgment. Mesko admitted that after the transfers, he had no valuable assets in his name. He possessed no saving or checking accounts, sold his interest in his landscaping company to Glenn Jackson, and the only property he retained after the transfer of the two properties to Appellant was the cabin in Pike County. Mesko Deposition Transcript, pp. 8-9, 64-65. Mesko's $500,000 debt to Appellee was greater than all of the assets Mesko owned **[*24]** subsequent to the transfer of the properties. Furthermore, Mesko was unable to pay the tax liability of the cabin property, which led to the loss of the property through sheriff's sale. Thus, Mesko paid neither the $500,000 judgment nor the taxes on the cabin property as they became due. This created a presumption of insolvency requiring the party against whom it was directed, Appellant in this matter as the third party recipient of the transferred property, to prove the nonexistence of insolvency was more probable than its existence. Appellant failed to present any evidence to prove the nonexistence of insolvency. Furthermore, the two transferred properties, valued at a combined $515,000, had sufficient value to compensate Appellee for the $500,000 judgment. Thus, Mesko's insolvency was the result of the transfers of the two properties satisfying the final element of Section 5105.

**5.) Appellant Failed to Provide Support for the Defense of Laches**

Appellant's Statement of Matters Complained of Number 5 raises the defense of laches as a defense to Appellee's cause of action. Appellant failed to present the basis for its claim to this Court. We note however that *HN12*⚓ UFTA, 12 Pa.C.S. §5109(2) provides that a cause of action **[*25]** with respect to a fraudulent transfer is extinguished unless the action is brought "under section 5104(a)(2) or 5105 (relating to transfers fraudulent as to present creditors), within four years after the transfer was made or the obligation was incurred." The transfers of the properties in this matter occurred on October 12, 2010 and Plaintiff initiated the cause of action via writ of summons on May 3, 2013. Therefore, the cause of action was timely filed pursuant to the statutory four (4) year standard.

Furthermore, *HN13*⚓ the equitable defense of laches "requires not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay." Class of Two Hundred Admin. Faculty Members of State Colleges in Com., by Reeser v. Scanlon, 502 Pa. 275, 466 A.2d 103, 105 (Pa. 1983). The $500,000 stipulated judgment obtained by Appellee in the underlying civil action was not indexed in the Lehigh County Court of Common Pleas until December 14, 2012. Approximately five (5) months later, Appellee initiated the instant action to collect upon said judgment. Appellant failed to present evidence to support a meritorious defense through the laches doctrine.

**C. The Money Judgment Remedy was Proper under the UFTA**

This Court's February 7, 2014 Order granted Appellee's Motion for Summary Judgment as to Counts II and **[*26]** III of Appellee's Complaint and directed the Prothonotary to enter judgment against Appellant in the principal amount of $315,000. Appellant argues that the UFTA does not permit the recovery of money judgments. We address Appellant's contention herein.

*HN14*⚓ 12 Pa.C.S. §5107 provides various remedies available to creditors if a transfer is proved fraudulent. These include avoidance of the transfer, attachment of the asset, injunction against further disposition by a debtor or transferee, appointment of a receiver, and any other relief the circumstances may require. We also note that 12 Pa.C.S. §5108(b) and (c) permit the recovery of a judgment for the value of an asset(s) transferred against the first transferee of the asset. Thus, Appellant's contention that the UFTA does not permit the recovery of money judgments is incorrect. Furthermore, the UFTA under Section 5107(a)(3)(iii) provides the court with the discretion to award any relief the circumstances require. See Kraisinger v. Kraisinger, 2011 PA Super 264, 34 A.3d 168, 175 (Pa. Super. 2011) (finding no abuse of discretion where the trial court awarded debtor's former counsel $40,026.13 in satisfaction of a judgment after finding the underlying property transfer to be fraudulent).

Although not specifically raised as an issue, we offer some reasoning in regards to the $315,000 **[*27]** amount awarded to Appellee. 12 Pa.C.S. §5108(c) states that a money judgment "must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." The Woodcock Road property was valued to have equity in the amount of $250,000 at the time of transfer. The Route 212 property was valued in the amount of $265,000 at the time of transfer and encumbered by a $200,000 line of credit, leaving a remainder of $65,000 in equity. Thus, the combined equity value of the properties, $315,000, was awarded to Appellee.

**II. This Court properly ruled upon Appellee's Motion for Summary Judgment and Appellant's Motion to Vacate considering that all essential parties to the action were named by Appellee.**

Appellant argues in his sixth through ninth Matters Complained of on Appeal that this Court erred in holding that Michael Mesko, Glenn Jackson, and Mesko Industries were not indispensable parties. These contentions will be discussed collectively below.

*HN15*⚓ Pa.R.C.P. §1032 dictates that "whenever it appears by suggestion of the parties or otherwise that . . . there has been a failure to join an indispensable party, the court shall order . . . that the indispensable party be joined, **[*28]** but if that is not possible, then it shall dismiss the action." Generally, this Court will find that a party is indispensable to an equity action when:

> . . . he has such an interest that a final decree cannot be made without affecting it, or leaving the controversy in such a condition that a final determination may be wholly inconsistent with equity and good conscience. That is to say, his presence as a party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights.

Mechanicsburg Area Sch. Dist. v. Kline, 494 Pa. 476, 431 A.2d 953, 956 (Pa. 1981).

*HN16*⚓ The Pennsylvania Supreme Court has offered at least four factors that a court should consider before making a determination as to the existence of an indispensable party. These include (1) whether an absent party

has a right/interest related to the claim, (2) identifying that right/interest, (3) establishing whether that right/interest is essential to the merits of the case, and (4) ensuring that justice can be done without violating the due process rights of the absent party. Id. "All [these] considerations . . . are themselves conclusions of law to be made by the court after due consideration. Bare factual allegations of a **[\*29]** party are not dispositive for the issues underlying the indispensable party question." Id. at 958 n.8.

*HN17* To establish whether a right or interest is essential to the merits of the case requires a court to conduct a further inquiry. An absent party's asserted right must be "so essential to the merits of the question,' such that it must be 'so much affected by the decree, that the court cannot proceed to a final decision of the cause, until they are parties." Id. at 957, citing Russell v. Clark's Ex'rs, 11 U.S. 69, 98, 3 L. Ed. 271 (1812). The Pennsylvania Supreme Court has further interpreted this question of essentialness to revolve around the directness of the connection between the asserted right and the particular case. In Columbia Gas Transportation Corp. v. Diamond Fuel Co., the Court held that "an indispensable party is one whose rights are so directly connected with and affected by litigation that he must be a party of record to protect such rights, and his absence renders any order or decree of court null and void for want of jurisdiction." 464 Pa. 377, 346 A.2d 788, 789 (Pa. 1975). The rights and interests asserted by Michael Mesko, Glenn Jackson, and Mesko Industries do not meet the abovementioned standard.


## A. Michael Mesko

In his deed conveying the properties at issue to. Appellant, Michael Mesko did **[\*30]** not retain any legal interest in those properties. Appellant alternatively claims that, as evidenced in Mesko's deposition testimony, Mesko did retain an option to repurchase the properties as well as the promise of future employment on the properties after his eventual release from incarceration. However, *HN18* Pennsylvania law regarding contract interpretation is well-settled as follows:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the, writing itself . . . When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.

Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 588 Pa. 470, 905 A.2d 462, 468 (Pa. 2006) (citations omitted).

Mesko transferred each of the properties at issue to MJC Industries, Inc. in exchange for $1.00 by deeds dated October 12, 2010, whereupon he did not retain any interest to the properties. The terms of the contract are clear and unambiguous. There is no clause or any other indication that. Mesko reserved a right for himself in the properties. As such, Mesko cannot satisfy even the first factor laid out by the Pennsylvania Supreme Court, that he has an existing right or interest. **[\*31]**

Appellant further offers that Mesko is an indispensable party due to his status as the transferor of the properties in this fraudulent transfer, claiming that a transferor must always be named in any action by a creditor. However, there is no support for this position in Pennsylvania law. In Temtex Products, Inc. v. Kramer, 330 Pa. Super. 183, 479 A.2d 500 (Pa. Super. 1984) the Superior Court was presented with a situation where a creditor attempted to seek relief from a fraudulent transfer engaged in by a debtor. The debtor, who was the fraudulent transferor, sought a stay of the action as a result of his pending bankruptcy proceeding; however, Superior Court denied his motion. The Court reasoned that "[t]he Bankruptcy Code does not bar proceedings in a case in which the bankruptcy debtor has no interest in the property at issue." Id. at 509. We find this reasoning persuasive, as Superior Court implicitly held that *HN19* the transferor in a fraudulent transfer action has no interest in transferred property after completion of the transfer.

We finally look to the Fraudulent Transfer Act itself to find support for our ruling that Mesko is not an indispensable party. 12 Pa.C.S. § 5107(a) specifically provides, "[i]n an action for relief against a transfer or obligation under this chapter, a creditor . . . may obtain: **[\*32]**

> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law.

> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

>> (i) an injunction against further disposition **by the debtor or a transferee, or both, of the asset transferred or of other property;**

>> (ii) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

>> (iii) any other relief the circumstances may require." (emphasis added).

*HN20* The statute clearly authorizes a creditor to seek damages from the original transferor OR the transferee OR

the asset transferred. The statute does not mandate that a transferor must be named in a recovery action, and on

its face, seems to suggest otherwise.

Additionally, and perhaps more significantly, the Comments to the statute offer further insight. In particular, *HN21* Comment (4) reads: "As under the Uniform Fraudulent Conveyance Act, a creditor is not required to obtain a judgment against the debtor-transferor **[*33]** or to have a matured claim in order to proceed under subsection (a)." We observe that if a transferor were a necessary party to a fraudulent transfer action, it would be superfluous for the legislature to authorize a creditor to proceed without a judgment against a party that would be joined in the underlying action. Appellant's main argument for Mesko being an indispensable party would create a logical incongruity within the statute itself, and therefore, it is without merit. By allowing a creditor to proceed under the Act without obtaining a prior judgment against the transferor, the legislature asserts that such a party is not indispensable to the action. As a result of this finding, Mesko is not an indispensable party.

### B. Glenn Jackson

Glenn Jackson likewise fails to meet the•standard to be considered an indispensable party as he does not have a direct right implicated in this litigation. Appellant stresses to this Court that as the owner and sole shareholder of MJC Industries, Jackson has a corresponding interest in the outcome of this case. Appellant further claims that this right stems from the losses that Jackson stands to bear as a result of this Court's potential entry of summary judgment **[*34]** against MJC Industries, his company. However, even if we accept Appellant's arguments, this right does not satisfy the third factor provided by the Pennsylvania Supreme Court, that any right must be essential to the merits of the case.

*HN22* In order to be essential, Jackson's right must be so "directly connected with and affected by litigation that he must be a party of record to protect such rights." The Superior Court, in deciding a case involving a shareholder's derivative action against the directors of its wholly owned subsidiary, provided the following in dicta: "An injury to a corporation may, to be sure, result in injury to the corporation's stockholders. Such injury, however, is regarded as "indirect", and insufficient to give rise to a direct cause of action by the stockholder." Burdon v. Erskine, 264 Pa. Super. 584, 401 A.2d 369, 370 (Pa. Super. 1979). While the case at bar involves a different factual scenario than Burdon, any injury that Jackson may suffer as a result of the present litigation would necessarily result from injury to MJC Industries. As such, Jackson's interest would be derivative of his holdings in MJC Industries, which stands in stark contrast to having a direct interest implicated in the litigation.

Furthermore, we observe that the **[*35]** Superior Court directly addressed Jackson's potential status as an indispensable party in its May 18, 2015 Memorandum Opinion, writing:

> It would be unusual, to say the least, that Jackson would be an indispensable party solely based upon his ownership of MJC. On its face, this would run counter to one of the purposes of the corporate form: To create a separate legal entity conferring upon its owner(s) the substantial benefit of protection from personal liability. Moreover, one need ponder only a moment to recognize that, were we to treat owners of corporate parties to litigation as indispensable to any litigation affecting the corporation, we would wreak havoc on the roles of shareholders in corporations subject to suit.

Super. Ct. Memorandum Opinion, 05/18/15, p. 15. In remanding the case to this Court, the Superior Court qualified

its view, adding:

> However, we cannot say with certainty that factual matters not of record would reveal complications to this general truth such that Jackson or Mesko would emerge as indispensable parties to this litigation. This is especially true inasmuch as the parties' personal and professional connections clearly colored the series of transactions underlying **[*36]** this dispute. Moreover, the parties squarely contest consideration in any dispute under the FTA, including asserting that Jackson's allegedly uncompensated work with and or for Mesko for over a year before the transfers, itself, constituted consideration well in excess of the documented $1.00 sale price of the two parcels at issue. . . . We direct the trial court to evaluate this issue in the first instance.

Super. Ct. Memorandum Opinion, 05/18/15, p. 16.

We follow the Superior Court's guidance in declaring Jackson an indispensable party to the action, and we further find that the factual matters particular to this case do not reveal sufficient complications to justify this Court reaching a different conclusion. At oral argument and in its pleadings, Appellant argued that Jackson performed uncompensated services for Mesko that amounted to consideration in excess of the $1.00 listed on each deed to the transferred properties. However, a closer look at the facts of record reveal no specific evidence in support of this claim. Jackson avers that he performed such uncompensated work in his deposition, yet is unable to confirm any of the exact services performed or the estimated value of such **[*37]** services. Additionally, Appellant's counsel discussed these services at oral argument, but no supporting evidence was ever placed in the record. As such, there is nothing in the record that can lead this Court to depart from the guidelines provided by the Pennsylvania Supreme Court, guidelines that result in Jackson not having a right essential to the merits of the case such that he would need to be a party to protect them. Therefore, Jackson is not an indispensable party.4⚖.

**C. Mesko Landscaping**

Mesko Landscaping also does not meet the standards necessary to be an indispensable party in the case. Appellant alleges that the sole interest belonging to Mesko Landscaping that is implicated in this litigation stems from the fact that its inventory is located on the **[*38]** property. Even taking Appellant's averments as true, this interest is not essential to the merits of the claim. *HN23* Essentialness necessarily involves the interest in question being so directly connected to the case that the party must be present to protect those interests. However, Appellee does not seek relief from the inventory belonging to Mesko Landscaping, but rather, solely from the property itself. The property, per the October 12, 2010 deed, belongs entirely to MJC Industries. Mesko Landscaping has no right or interest in this property, and any inventory that it may have that is present on the property is not implicated in this litigation. Therefore, Mesko Landscaping is not an indispensable party to this action.

**CONCLUSION**

For the foregoing reasons, this Court perceives that the issues of which Appellant has complained in this appeal are without merit, and that this Court's June 21, 2016 Order was supported by both the law and the record in this case. We respectfully request the Superior Court to affirm this Court's decision.

BY THE COURT:

/s/ Wallace H. Bateman, Jr. ▾

WALLACE H. BATEMAN, JR. ▾, J.

August 4, 2016

Date

---

**Footnotes**

**1** ⊤    Previously, this Court issued an Order on February 7, 2014 granting Summary Judgment on Counts II and III of Appellee's Complaint. Considering that our June 21, 2016 Order granted the withdrawal of each of the remaining Counts of Appellee's Complaint, it was a final, appealable Order.

**2** ⊤    The below section of analysis (I.) has been duplicated in its entirety from this Court's June 30, 2014 Opinion in this Matter. Appellant's first five (5) Matters Complained of on Appeal are identical in nature to those raised in his previous Appeal, and our analysis of these claims remains the same. The Superior Court correctly observed that Appellant's prior Appeal was interlocutory in nature and, therefore, did not render a decision upon the claims of Appellant or this Court's reasoning as expressed in our Opinion. See Trial Court Opinion, 06/30/14, pp. 4-15.

**3** ⊤    12 Pa. C.S. § 5104(a)(1) requires that the debtor have acted "with actual intent to hinder, delay or defraud any creditor of the debtor." Since Appellee has raised the second option pursuant to 12 Pa. C.S. § 5104(a)(2), actual intent to defraud was not required on the part of Mesko.

**4** ⊤    We cannot ignore the glaring conflict within Appellant's counsel's argument presented at oral argument, where he advocated that another of his clients, Glenn Jackson, is an essential party who should be joined in this litigation. While seated beside Jackson at counsel table, counsel attempted to justify the facially

apparent conflict by claiming that Jackson was not his client during oral argument, which we find to be perplexing.

**Content Type:** Cases

**Terms:** 12 PAcs 5108

**Narrow By:** -None-

**Date and Time:** Nov 01, 2019   03:55:15 p.m. EDT



About LexisNexis®     Privacy Policy     Terms & Conditions     Sign Out     Copyright © 2019 LexisNexis. All rights reserved.     RELX Group™     Print